Filed 5/15/15  P. v. Rogel CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G049102 |
| v. | (Super. Ct. No. 11NF3214) |
| IVAN ROGEL, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Carla Singer, Judge.  Affirmed in part, reversed in part, and remanded for resentencing.

Anthony J. Dain, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Peter Quon, Jr., Parag Agrawal and Ryan Harrison Peeck, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Ivan Rogel of attempted murder (count 1), aggravated assault with a knife (counts 2, 3), misdemeanor assault on a peace officer (count 4), and misdemeanor simple assault (count 6). The jury also found true sentence enhancement allegations that counts 1 through 3 were committed at the direction of, in association with, or for the benefit of a criminal street gang (Underhill), and that Rogel personally inflicted great bodily injury on the victims. The court sentenced Rogel to a total prison term of 22 years, including 10 years for the gang enhancement on count 1.

Rogel challenges the sufficiency of the evidence to support the gang enhancement findings, and we agree. No substantial evidence proves Rogel committed attempted murder and aggravated assault to benefit or promote Underhill, or that he acted with the specific intent to benefit Underhill. Consequently, we reverse the gang enhancement attached to counts 1 through 3 for insufficiency of the evidence.

Rogel also claims the court misdirected the jury on the primary activities element of the gang enhancement jury instruction and failed to instruct on voluntary intoxication as it relates to the specific intent element of the gang enhancement. But, in light of our conclusion insufficient evidence supports the gang enhancement findings, there will be no retrial and we need not reach these issues.

Rogel's remaining claims are: the court denied him a fair trial by admitting evidence of his prior gang-related contacts with law enforcement and by improperly denying his mistrial motion based on jury misconduct; the prosecutor committed misconduct by not controlling the gang expert's testimony and by displaying an irrelevant picture of gang members during closing argument; and cumulative error as the result of multiple acts of prosecutorial misconduct. We find these claims meritless.

For these reasons, which we will explain more fully below, we affirm the convictions and the great bodily injury enhancement findings, but reverse the gang enhancement findings. As modified, the judgment is affirmed and the matter is remanded for resentencing.

## FACTS

On October 29, 2011, Nicholas Soto, his pregnant wife, Rebecca Vega, Rebecca's father, Frank Vega, and her mother, Nicole Martinez, attended a Halloween party at a house on North Carol Street in Anahiem.[1]  This is an area in Anaheim not known to be in any criminal street gang's claimed territory.  The party was large and loud, and Soto's family spent most of their time standing together near a small backyard patio that people were using as a dance floor.  Frank, who was wearing a full-body gorilla costume with headdress, said the party had music, a disc jockey, and beer.

About an hour after Soto and his family arrived, a group of young men walked into the backyard.  Someone at the party told Soto they thought the young men were uninvited Underhill gang members.

Sometime later, Rebecca and Soto saw two young men groping Martinez while she tried to dance.  Soto intervened and the two young men engaged him in a cursing match.  One of the young men yelled to Soto, "You don't know who you're messing with."  The verbal exchange turned physical, and a group of partygoers gathered around the combatants.  When the dust settled, Soto discovered he had been stabbed in the elbow and right rib cage.

Soto pointed to a male Hispanic about 18 years old, five feet, eight inches tall with medium build, wearing a blue and white checked shirt and a dark hat, and he told Rebecca that person had stabbed him.  Rebecca saw this man run and join a "group of . . . guys" standing together in a different part of the backyard.

Frank, still in his gorilla costume minus the headdress, did not see the scuffle on the dance floor, but "a bunch of screaming" drew his attention there.  Frank started to separate the combatants as he searched for Rebecca.  When he found her,

---

[1]  To avoid confusion, we refer to Frank Vega and Rebecca Vega by their first names.

Rebecca said, "Nick was stabbed." Frank lifted Soto's shirt and exclaimed, "What the hell?" He turned around and saw a bunch of guys. Rebecca pointed at someone in a checked shirt and black hat and said, "Dad, it's him."

Frank tried to grab the man in the checked shirt as the man attempted to leave the party, which started another fight. Frank eventually fell to the ground where, it seemed to him, several people repeatedly punched and kicked him. Later, Frank discovered he had also been stabbed. After the fight, friends took Frank to the hospital where he spent the next two weeks recovering from seven stab wounds.

Meanwhile, Rebecca took Soto inside to check his wounds before he was transported to the hospital by ambulance. While Rebecca and Soto were inside they heard a car crash in front of the house. When they ran outside, Rebecca and Soto saw a car bumper lying in the street and several police officers around the house.

Unbeknownst to the partygoers, Anaheim Police Officers Matt Ellis and Brandon Young, Anaheim Police Sergeant Steve Pena, and Anaheim cadet Marcus Zappia had gone to North Carol Street on reports of a loud party and a fight. Ellis and Young arrived before the fight, and they called for backup when the fight broke out. Pena and Zappia responded, but the fight was over by the time they arrived.

The four officers were in different places around the house when they all heard what sounded like a car crash. Making their way to the street, the officers saw a silver Honda Civic reversing away from a damaged parked car at about 20 miles per hour. The Civic collided with another car before it backed to the end of the cul-de-sac.

Pena and Zappia approached the Civic on foot. Just as Zappia shined a light on the Civic, the car lurched forward and headed out of the cul-de-sac at a high rate of speed, nearly hitting Pena and Zappia in the process. Pena and Zappia got a good look at the driver of the Civic. They both identified Rogel as the driver, and they said Rogel was wearing a checked shirt.

4

Ellis used a patrol car to intercept the Civic. As the Civic approached, it swerved and crashed into Ellis's patrol car. Rogel was able to drive away, but the officers pursued him. Ellis chased Rogel through various neighborhoods at speeds up to 40 miles per hour before the Civic collided with another parked car. Rogel jumped out of the now disabled Civic and ran through several backyards before officers caught him.

At the time of his arrest, Rogel was wearing a checked shirt and black pants. He had visible cuts on his hands, and blood on his knuckles and clothing. Rogel was five feet, nine inches tall and weighed 150 pounds. Ellis and Young noticed that Rogel smelled of alcohol, and that he had bloodshot eyes and a wobbly gait.

Soto later picked Rogel's picture in a photographic lineup. Rebecca was also shown the photographic lineup. She pointed to Rogel's picture, but said she was not sure if that person was the stabber, or merely someone she remembered seeing at the party. Rebecca also told officers she had recognized a friend of hers at the party, Oscar Ivan Baiza, and she told them Baiza was an Underhill gang member when she knew him in high school. Rebecca did not see Baiza and defendant together at the party. In fact, she testified Baiza left the party before the fighting started.

*Gang Expert Testimony*

Anaheim Police Detective Mike Brown testified as the prosecution's gang expert. A 10-year police veteran, Brown has participated in over 200 gang-related crime investigations over his four years with the gang division, and he has qualified in court as a gang expert on numerous occasions. In addition to extensive training and experience with gangs, Brown has daily contact with members of the over 30 active criminal street gangs in Anaheim. During these contacts, Brown and other officers generate field identification cards for the suspected gang members they contact. The field identification cards contain the suspected gang member's vital statistics, a description of his or her clothing, tattoos, and any other distinguishing marks. It may also include statements the individual makes regarding his or her gang affiliation.

5

According to Brown, police officers also distribute Street Terrorism Enforcement and Prevention Act (STEP) notices to suspected gang members. Giving someone a STEP notice lets the person know that law enforcement considers him or her to be a member of a criminal street gang. The notice advises the recipient of the enhanced penalties available when convicted of gang-related crimes.

Brown stated individuals gain membership in a gang by being beaten by a group of gang members (jumped-in), by having family members already in the gang (walked-in), or by committing a crime for the gang (crimed-in). With respect to Hispanic criminal street gangs, Brown said these gangs tend to be territorial and claim neighborhoods in the city as their "turf," although he admitted the instant crimes occurred in a neighborhood as yet unclaimed by any known criminal street gang. He also said the number 13 is very important in Hispanic gang culture because it can represent the 13th letter of the alphabet, M, and the letter M is associated with the Mexican Mafia. Brown testified most of the Hispanic gangs in Anahiem "fall under" the Mexican Mafia.

Brown also testified gang members consider tattoos to be a badge of honor and a way to advertise loyalty to their gang. In fact, Brown testified, "[i]t's a huge disrespect for anybody to get a tattoo representing a gang that they're not from." Graffiti, too, represents the gang, and it is used to mark turf. It is a sign of disrespect to write graffiti in a rival gang's territory. Brown also described what occurs during a gang "hit-up." Brown claimed a gang hit-up can be a verbal or nonverbal challenge, including throwing gang hand signs or asking someone, "Where you from?" Hit-ups usually result in violence.

Brown stated respect is the most important thing to gang members. An act of disrespect triggers a violent response. In fact, gang members may suffer consequences for not responding to another person's disrespect. Furthermore, it is the violent gangs and gang members who garner the most respect.

As Brown explained it, acts of violence are one way to gain respect and demonstrate the will "do what the gang wants them to do." Violent acts are also a way for young gang members to "put-in" work for their gang and enhance their reputation. The same is true of "backing-up," or assisting, another gang member in the commission of an assault or other crime.

Brown also said gang members often brag about violent crimes and acts of violence they commit, all in an effort to establish a fearsome reputation. Brown explained victims of gang-related crimes are often reluctant to cooperate with police because they fear retaliation from the gang. As he described, "It's harder for us to go in and investigate a crime in a gang neighborhood if the neighborhood won't even talk to us. And that happens on a regular basis because the gang itself has [instilled] so much fear within the neighborhood. If they cooperate with the police, if they're seen talking to the police, if they're a witness or a victim in a crime that was committed within their neighborhood they could be assaulted in the future." Accordingly, the commission of particularly violent crimes benefits the individual gang member and his gang by instilling fear in the community and rival gang members. By the same token, gang members rarely cooperate with police because they do not want to be labeled "a rat."

During his career, Brown has investigated more than 50 crimes committed by members of the Underhill criminal street gang, and he has spoken to over 100 Underhill members. According to Brown, Underhill's known rivals include the gangs La Jolla, East Side Anaheim, and Barrios Small Town. Brown said Underhill started as a party crew in 1985 in the area of State College Boulevard and Underhill Street in Anaheim. Over time, the gang's territory shifted, and the gang now uses several names, including Underhill, Underhill Street, Hillside, and Los Cyclones. Brown testified common symbols representing Underhill are "AUST," for Anaheim Underhill Street, "UST" for Underhill Street, and the letter "U." The gang also has recognized hand signs and graffiti.

7

Brown opined that Underhill had approximately 15 to 25 members and around 50 active participants and associates in October 2011. According to Brown, once an associate commits "to participating in a criminal activity with the individual, they [sic] become more of an active participant of that gang."

Brown testified the primary activity of Underhill was the commission of felony vandalism and felony weapons possession or gun possession. He also testified about two felonies committed by documented Underhill members for the benefit of Underhill. The first was a 2008 aggravated assault committed by Underhill member Rafael Reyes. The second was a 2007 carjacking, robbery, and gun possession committed by gang member Brendon Ruelas.

Brown testified he knew Rogel from several in-field contacts. Brown said gang members are often known by a gang moniker, or nickname, which may be a childhood name or a physical characteristic or trait. Brown knew Rogel's gang moniker, Chucky, although he did not know the story behind the nickname. Brown said he also knew Baiza from several previous contacts in Underhill territory, and he believed Baiza was an Underhill associate.

Brown testified to numerous police contacts with Rogel in 2009 and 2010. In November 2009, undercover police officers twice found Rogel in Underhill's claimed territory with other documented Underhill members. In December, Rogel and three documented Underhill members were stopped as they drove through Underhill's claimed territory. The arresting officers saw blood on the face of one of the occupants of the car and stopped the car for traffic violations. Officers searched the passenger compartment and found a sawed off shotgun and a sock full of shotgun shells. When contacted at the scene, Rogel said he knew there was a shotgun in the car.

In May 2010, Rogel told Brown he associated with Underhill, and other officers saw Rogel in Underhill's claimed territory. In June, Brown conducted a search of Rogel's home. He found a book containing graffiti of the letters "UST," and the

8

words, "Chucky," and "Hillside." In July, defendant was discovered in Underhill's claimed territory with a butterfly knife. Rogel told officers he kept the knife for protection. In September, police officers detained Rogel in connection with fresh graffiti in Underhill's claimed territory. According to Brown, Rogel's frequent trips to Underhill's claimed territory suggested Rogel "associate[d] with individuals that live in that neighborhood and belong in that."

Brown also pointed to Rogel's tattoos ("Hillside" is tattooed on his right hand, "Cyclones" on his right fingers, and the letter "A" on his right leg), and he testified the tattoos were further evidence of Rogel's gang affiliation. Brown testified "Hillside" refers to the Underhill gang, and "Cyclones" is a subset of the Underhill gang. The letter "A" is a common tattoo for all Anaheim gang members. Brown said Rogel added all but one of his tattoos after his arrest in this case. In Brown's opinion, Rogel was an active participant in Underhill when he committed the charged offenses. The fact Rogel added new gang tattoos after committing these crimes merely confirmed Brown's belief.

The prosecutor asked Brown to assume the following facts: "A known and documented Orange County gang member is at a house party in the City of Anaheim. While at the party and in front of numerous people, the gang member is confronted and accused of inappropriate behavior towards a middle-aged female . . . . [¶] . . . [¶] by a young male adult. After being confronted, the gang member stabs the individual who had confronted him in the chest with a knife. [¶] Shortly after the first stabbing, the gang member is then involved in a second altercation with a male in his mid-30's, who is associated with . . . the first stabbing victim. During this incident, the gang member stabs the man seven times in the chest and in the back with a knife, causing grave injuries. [¶] After this incident, the gang member flees from the area and, to avoid capture, drives his car at a high rate of speed at a police sergeant and a police cadet nearly hitting them. The gang member then rams a police car. That police car was attempting to block the gang member's exit at the time it was struck. The gang member continues to flee at a high rate

9

of speed while being pursued by multiple police officers in pursuit. [¶] After crashing his car, the gang member runs from the car while being chased by multiple police officers through several yards. The gang member is taken into custody after an extensive search. [¶] Some additional facts: That also at that same party was another known associate of the same gang."

The prosecutor then asked a hypothetical using these assumed facts, and Brown opined the attempted murder and aggravated assaults were committed at the direction of, for the benefit of, or in association with the Underhill gang. Brown based his opinion on "the totality of the circumstances, knowing that there was other associates of Underhill . . . present at the time the crime was committed or prior to the crime being committed, individuals at that party knew other individuals that possibly may be involved with Underhill were there, and the violent act of the crime itself."

Again using these assumed facts, the prosecutor asked if "a crime such as the one described in the hypothetical promote, further or assist the gang?" Brown said it would and for the same reasons.

Brown acknowledged the crimes were not committed in Underhill territory. Still, Brown said, Underhill benefitted from the commission of these crimes because the crimes instilled fear in the community where the crimes occurred and in Underhill's rivals. He also observed that the hypothetical gang member's actions showed other gangs and gang members that Underhill has no regard for law enforcement.

*Defense*

Defendant called Dr. Robert Shomer to testify as an expert in eyewitness identification. According to Shomer, eyewitness identification is the least reliable means of identification available, and an eyewitness's confidence in his or her identification has little correlation with the accuracy of the identification. High-stress situations tend to impair the accuracy of eyewitnesses. He also explained "source confusion" as something that happens when a witness misidentifies a bystander to a crime for the perpetrator.

10

According to Shomer, Rebecca and Soto's identifications of defendant were vulnerable due to the high-stress situation of the fight and the chaos of multiple bystanders. Moreover, Shomer testified, Soto's identification of Rogel from the photographic lineup could have been tainted by suggestive police lineup procedures.

**DISCUSSION**

*1. Sufficiency of the Evidence - Gang Enhancements*

Rogel challenges the sufficiency of the evidence to support the jury's findings that the attempted murder of Frank (count 1), and the aggravated assaults upon Frank and Soto (counts 2 and 3) were gang related. (Pen. Code, § 186.22 subd. (b)(1).)

*a. Elements, Proof and Standard of Review*

To prove a gang enhancement under Penal Code section 186.22, subdivision (b)(1), the People must show the defendant committed a crime "for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members . . . ." "The gang enhancement under [Penal Code] section 186.22[, subdivision] (b)(1) requires both that the felony be gang related and that the defendant act with a specific intent to promote, further, or assist the gang . . . ." (*People v. Rodriguez* (2012) 55 Cal.4th 1125, 1138-1139.) The enhancement applies only to "gang-related" crimes. (*People v. Castenada* (2000) 23 Cal.4th 743, 745.) "Not every crime committed by gang members is related to a gang." (*People v. Albillar* (2010) 51 Cal.4th 47, 60.)

"[E]xpert testimony about gang culture and habits [may be used] to reach a finding on a gang allegation. [Citation.]" (*In re Frank S.* (2006) 141 Cal.App.4th 1192, 1196 (*Frank S.*).) An expert's opinion that "particular criminal conduct benefited a gang by enhancing its reputation for viciousness can be sufficient to raise the inference that the conduct was 'committed for the benefit of . . . a[] criminal street gang' within the meaning of [Penal Code] section 186.22[, subdivision] (b)(1)." (*People v. Albillar*, *supra*, 51 Cal.4th at p. 63; see *People v. Vang* (2011) 52 Cal.4th 1038, 1048.)

11

Our task in reviewing the sufficiency of the evidence is to examine the whole record in the light most favorable to the judgment to determine whether it discloses reasonable, credible, and solid evidence from which a reasonable juror could find the defendant guilty beyond a reasonable doubt. (*People v. Johnson* (1980) 26 Cal.3d 557, 576-577.) "'""""If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment."' [Citations.]" [Citation.]' [Citations.]" (*People v. Cravens* (2012) 53 Cal.4th 500, 507-508.) In other words, a conviction stands "'unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].'" [Citation.]" (*Id.* at p. 508.)

### b. *Insufficient Evidence*

Rogel asserts the prosecution failed to prove the fight on the dance floor was anything more than a solo dispute over Rogel's inappropriate advances towards Martinez. Moreover, Rogel argues, the absence of evidence the fight involved other gang members, gang-related challenges or threats, displays of gang-related tattoos, hand signs, or clothing, and the fact the crimes occurred in neutral territory, fatally undermines gang expert Brown's opinion that the crimes were gang related. We agree.

The cases of *Frank S*, *supra*, 141 Cal.App.4th at p. 1192, and *People v. Ochoa* (2009) 179 Cal.App.4th 650 (*Ochoa*) are instructive. In *Frank S.* a police officer stopped a minor for running a red light on his bicycle, and found a concealed knife, a bindle of methamphetamine, and a red bandana in the minor's possession. (*Frank S.*, *supra*, 141 Cal.App.4th at p. 1195.) The minor told police he had been attacked two days earlier and "needed the knife for protection against 'the Southerners' because they feel he supports northern street gangs." (*Ibid.*) The minor identified himself as a Norteno gang affiliate. (*Ibid.*) According to the trial testimony of a gang expert, the minor was an active Norteno and his possession of the knife benefitted his gang because "it helps provide them protection should they be assaulted." (*Id.* at pp. 1195-1196.)

12

The appellate court reversed the gang enhancement finding stating: "In the present case, the expert simply informed the judge of her belief of the minor's intent with possession of the knife, an issue reserved to the trier of fact. She stated the knife benefits the Nortenos since 'it helps provide them protection should they be assaulted by rival gang members.' However, unlike in other cases, the prosecution presented no evidence other than the expert's opinion regarding gangs in general and the expert's improper opinion on the ultimate issue to establish that possession of the weapon was 'committed for the benefit of, at the direction of, or in association with any criminal street gang . . . .' [Citation.] The prosecution did not present any evidence that the minor was in gang territory, had gang members with him, or had any reason to expect to use the knife in a gang-related offense. In fact, the only other evidence was the minor's statement to the arresting officer that he had been jumped two days prior and needed the knife for protection. To allow the expert to state the minor's specific intent for the knife without any other substantial evidence opens the door for prosecutors to enhance many felonies as gang-related and extends the purpose of the statute beyond what the Legislature intended." (*Frank S.*, *supra*, 141 Cal.App.4th at p. 1199.) In sum, the "evidence established the minor has an affiliation with the Nortenos," but "membership alone does not prove a specific intent to use the knife to promote, further, or assist in criminal conduct by gang members." (*Ibid.*)

Similarly, in *Ochoa* the defendant acted alone in committing a carjacking with a shotgun. (*Ochoa*, *supra*, 179 Cal.App.4th at pp. 653, 662.) There was no evidence the defendant called out a gang name, displayed gang hand signs, wore gang clothing, or that the victim saw the defendant's gang-related tattoos. (*Ochoa*, *supra*, 179 Cal.App.4th at pp. 662-623.) Furthermore, the crime had not occurred in the defendant's gang's claimed territory, nor had it occurred in any rival gang's territory. (*Ibid.*) Therefore, the court found, the evidence was insufficient to sustain the gang-related prong of the gang enhancements.

13

The *Ochoa* court explained, "There was no evidence that gang members committed carjackings or that a gang member could not commit a carjacking for personal benefit, rather than for the benefit of the gang.  . . . .  While the sergeant effectively testified that carjacking by a gang member would always be for the benefit of the gang, this '"did nothing more than [improperly] inform the jury how [the expert] believed the case should be decided,"' without any underlying factual basis to support it." (*Ochoa*, *supra*, 179 Cal.App.4th at p. 662.)

Attempting to distinguish *Ochoa* and *Frank S.*, the People assert the "gang expert testimony and the presence of at least one Underhill gang member at the party" support a finding the crimes benefitted Underhill.   They claim Brown did not merely speculate Rogel's crimes benefitted Underhill.  Instead, "[t]he expert's testimony was supported by words that were spoken at the scene, [Rogel's] actions subsequent to the stabbings, including acquiring gang tattoos after the stabbings, [Rogel's] earlier self-admission that he was a[n] Underhill gang member, repeatedly being in the company of other gang members, his possession of gang-related graffiti, and the documented criminal history of other Underhill gang members."  The facts are rather slimmer than that.

The undisputed evidence is Rogel acted with an unidentified compatriot, not Baiza, in the groping of Martinez.  Based upon the record before us, it appears Soto was stabbed for interfering with Rogel's aggressive attempt to dance with Martinez, and Frank was hurt simply because he tried to prevent Rogel from leaving.

There is no evidence any other gang members were involved in the fight, or that any other gang member was at the party when it started.  Rebecca had seen Baiza earlier, and knew he had been an Underhill member in high school, but the parties agree Baiza left before the fight started.   None of the witnesses tied Baiza or any other suspected Underhill gang members to Rogel.  Frank heard rumors other Underhill gang members were present, but rumors are not evidence.  Further, nothing in the record suggests either the victims or the witnesses even knew Rogel was a gang member.

14

True, one of the two young men who accosted Martinez said something threatening before the fight started, but there was no gang reference of any kind. Neither Rogel nor his unidentified companion ever issued any gang challenges or threats, flashed any gang signs, or shouted any gang slogans. In addition, it is also undisputed the crimes did not occur in Underhill's claimed territory or in any rival gang's territory.

In short, Rogel did not associate with any other gang members at the party, and he did nothing at the party to identify himself as an Underhill gang member, before, during or after committing the attempted murder and the aggravated assaults. Rogel's words and actions that night simply do not support Brown's gang-related opinions.

The fact Rogel got new gang tattoos after he was arrested in this case is not substantial evidence of his intent in committing the charged offenses. It is relevant to show his Underhill membership, which was never seriously contested, but gang membership alone does warrant the enhanced penalties provided by Penal Code section 186.22. (*Frank S.*, *supra*, 141 Cal.App.4th at p. 1199.) Plus gang membership, by definition, involves frequent association with other gang members, possession of gang graffiti, and a host of other peculiarities endemic to gang culture as testified to by Brown.

So here, as is in *Frank S.* and *Ochoa*, the prosecution presented no evidence to establish the gang enhancements, other than Brown's opinions on the ultimate issues. And Brown opinions did nothing more than improperly inform the jury how he believed the gang enhancements should be decided, without any underlying factual support.

On these points *In re Daniel C.* (2011) 195 Cal.App.4th 1350 (*Daniel C.*) is also instructive. There, a minor entered a supermarket with two other young men. After his companions left the store, the minor took a bottle of whiskey and walked out without paying for it. A store employee confronted him, and the minor broke the bottle, hit the employee with the broken bottle, and ran. (*Id.* at p. 1353.) He was seen fleeing in a truck with three other young men. The police later located the truck, the minor, and his companions, all of whom were wearing clothing with some red in it. (*Id.* at p. 1354.)

15

The minor admitted going to the store to get alcohol, but he said his friends did not know he intended to steal it. (*Daniel C.*, *supra*, 195 Cal.App.4th at p. 1354. ) The minor was a Norteno gang affiliate, one of his friends was a gang member, and another was a gang associate. (*Id.* at pp. 1357-1358.) The juvenile court found true allegations the minor committed a robbery. The court also made true findings on three separate enhancement allegations, including a gang enhancement. (*Id.* at p. 1357.)

On appeal, the appellate court concluded there was insufficient evidence to support the specific intent prong of the enhancement. (*Daniel C., supra,* 195 Cal.App.4th at pp. 1357-1365.) There was no substantial evidence which tied the minor's acts to his gang when he stole the whiskey and assaulted the store employee. Of particular note, the minor's companions had already left the store *before* he took the alcohol, and they did not assist the minor in the theft or assault. (*Id.* at p. 1361.)

The *Daniel C.* court also found insufficient evidence to support the gang expert's opinion the minor and his companions "planned or executed a violent crime in concert . . . to enhance their respect in the community or, to instill fear," primarily because no evidence suggested they entered the store with the intent to commit a violent crime. (*Daniel C.*, *supra*, 195 Cal.App.4th at pp. 1363-1364.) The juvenile court specifically found that "the breaking of the bottle was 'happenstance,'" and the attack on the employee was a "spur-of-the-moment" reaction. (*Id.* at p. 1363.)

Here, too, after Baiza left the party, Rogel engaged in a spur-of-the-moment altercation in reaction to Soto's interference on the patio dance floor. It was happenstance that Rogel upped the ante by wielding his knife and two people were seriously injured as a result, but the prosecution failed to present substantial evidence the stabbings were for the benefit of Underhill, or that Rogel committed these crimes with the specific intent to promote Underhill. Hence, the gang enhancement findings must be reversed and the matter must be remanded for resentencing. In light of this disposition, we need not address Rogel's challenges to the gang enhancement jury instructions.

16

*2. Gang Evidence - Constitutional Right to Fair Trial*

Rogel also complains his constitutional right to a fair trial was compromised due to the prosecution's insistence on pursuing irrelevant gang allegations. He specifically lists two points during the trial at which his constitutional rights were purportedly violated. We discuss and reject each in turn.

*a. Mistrial Motion*

The first of these asserted errors occurred during voir dire and involves the trial court's denial of Rogel's mistrial motion. Rogel obliquely argues the court abused its discretion by denying his mistrial motion, but he does not provide either reasoned argument or citation to authority. While we are not required to consider this claim on the merits (*People v. Islas* (2012) 210 Cal.App.4th 116, 128), we review the record and conclude the court did not err.

At the beginning of voir dire, the court read the charges, including the gang enhancements alleged against Rogel. Many potential jurors' voiced concern about sitting on a case involving criminal street gang allegations and several were excused and replaced on this basis. Part way through the process, the court asked a group of replacement jurors if there was anything they wanted to say. When it came to the juror sitting in seat No. 15, the court asked, "Anything I need to know about you?" The juror responded, "Yes. I had a 19-year-old nephew in 2002 and he was – the person that killed him was a member of Anahiem Underhill street gang." The court asked the juror if he would be a "good juror in this case," and the juror responded that he could "see both sides." Although the juror admitted feeling resentment at the loss of his nephew, he told the court he could be a fair and impartial juror in this case.

A short time later, after an unreported sidebar discussion, the court excused three jurors, including the juror seated in position No. 15, and continued with voir dire. The following day, defense counsel moved for a mistrial. After a brief discussion the court denied the motion, subject to case law either party might present in the future.

17

The following morning, defense counsel raised the issue again.  On this occasion, counsel conceded he should have asked the court to strike the entire venire and repeat voir dire.  In the alternative, counsel asked the court to admonish the jurors that statements given by prospective jurors during voir dire are not evidence.  The court denied Rogel's mistrial motion, but gave the admonishment requested by the defense.

The denial of a motion for mistrial is reviewed under the abuse of discretion standard, and should be granted only when a party's chances of receiving a fair trial have been irreparably damaged.  (*People v. Ayala* (2000) 23 Cal.4th 225, 282.)  The denial of a motion to dismiss an entire jury panel is also reviewed under the abuse of discretion standard.  (*People v. Martinez* (1991) 228 Cal.App.3d. 1456, 1466-1467.)

The court here found Rogel was not unduly prejudiced by the juror's revelation, and Rogel has failed to show his chance of receiving a fair trial was irreparably damaged.  As noted, a number of jurors voiced concern about sitting on a case involving gangs.  The one juror with personal experience with gangs was excused, and the jury court admonished, "Statements given by prospective jurors during jury selection also is not evidence."  In our view, the court correctly denied defendant's mistrial motion and properly limited the definition of evidence to facts adduced during trial.

### b.  Butterfly Knife and Shotgun Evidence

Prior to trial, Rogel moved under Evidence Code section 352 to exclude evidence he possessed a butterfly knife in July 2010 and jointly possessed a shotgun in December 2009.  The court denied Rogel's motion, concluding evidence of his prior contacts with law enforcement tended to prove his "gang affiliation, which goes directly to the allegation that the defendant committed the present crimes for the benefit of, in association with, or at the direction of [Underhill]."  The court also found evidence of these two weapons possession incidents would not be unduly prejudicial.

Rogel claims the court abused its discretion by admitting evidence of these two weapons possession incidents.  We disagree.

18

"The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) This "permits the trial judge to strike a careful balance between the probative value of the evidence and the danger of prejudice, confusion and undue time consumption," and "requires that the danger of these evils substantially outweighs the probative value of the evidence." (*People v. Lavergne* (1971) 4 Cal.3d 735, 744; see also *People v. Tran* (2011) 51 Cal.4th 1040, 1047.) "A trial court's exercise of discretion in admitting or excluding . . . will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner . . . ." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9-10.)

The court here carefully weighed the evidentiary value of Rogel's history with weapons and his association with Underhilll against its potential for undue prejudice. Evidence Rogel twice possessed weapons in Underhill's claimed territory, once while he was in the company of other Underhilll gang members, was relevant to the gang enhancement allegations and not any more prejudicial than the facts of the underlying crimes. So the court made a reasoned decision to admit this evidence, and Rogel fails to establish that decision was arbitrary, capricious, or patently absurd.

Additionally, the court gave CALCRIM No. 1403, which explained the jury could only consider the gang evidence for the limited purpose of determining whether the defendant acted with the intent required to prove the enhancement and his motive, or the credibility of a witness. We presume the jurors followed this limiting instruction and considered evidence of Rogel's prior police contacts and weapons possessions solely to prove his intent and motive with respect to the gang allegations. (See *People v. Yoder* (1979) 100 Cal.App.3d 333, 338.) In light of this admonishment and on this record, any claimed error could not have been prejudicial. (Evid. Code, § 353 [miscarriage of justice required to set aside a verdict or finding based on improperly admitted evidence].)

19

*3. Prosecutorial Misconduct*

"When a prosecutor's intemperate behavior is sufficiently egregious that it infects the trial with such a degree of unfairness as to render the subsequent conviction a denial of due process, the federal Constitution is violated. Prosecutorial misconduct that falls short of rendering the trial fundamentally unfair may still constitute misconduct under state law if it involves the use of deceptive or reprehensible methods to persuade the trial court or the jury. [Citation.]" (*People v. Panah* (2005) 35 Cal.4th 395, 462.)

"'In order to preserve a claim of misconduct, a defendant must make a timely objection and request an admonition; only if an admonition would not have cured the harm is the claim of misconduct preserved for review.' [Citation.] When a claim of misconduct is based on the prosecutor's comments before the jury, "'the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.'" [Citations.]" (*People v. Friend* (2009) 47 Cal.4th 1, 29, 97.)

*a. Probation Status*

Rogel claims prosecutorial misconduct concerning evidence of his probation status. During a discussion between court and counsel concerning Rogel's prior police contacts, the court learned Brown discovered the butterfly knife during a probation search. Later, when the court ruled admissible the prior-contacts evidence, the court also observed, "the fact [Rogel] was on probation at that time is unnecessary to the officer's opinion and could in itself be more prejudicial than probative."

Still later, during the direct examination of Brown, the prosecutor made a reference to the July 2010 butterfly knife incident and engaged Brown in the following colloquy: "[Prosecutor] You spoke of the fact that there was an occasion at which you were at Mr. Rogel's residence? [¶] . . . [¶] [Brown] He was on probation. We were there conducting a probation check and his sister allowed us in the house." There was no objection and Brown testified about the probation search.

20

A few questions later, the prosecutor asked, "Was there also a time in which Mr. Rogel was contacted on July 15, 2010?" Brown said yes. The prosecutor asked, "During that occasion was Mr. Rogel contacted by law enforcement?" Brown answered, "I believe he was contacted by probation officers who were walking in the neighborhood." Defense counsel objected on Evidence Code section 352 grounds.

The court declared a recess, and conducted a hearing outside the presence of the jury. At the conclusion of this hearing, the court told the prosecutor, "I would caution you not to ask any question or elicit any answer that indentifies [Rogel] as a probationer because it is irrelevant and it is highly prejudicial to the defendant . . . ." There were no further references to Rogel's probationary status.

Because defense counsel never objected on prosecutorial misconduct grounds, Rogel has forfeited the issue on appeal. Notwithstanding that forfeiture, we find no misconduct. Nothing suggests the prosecutor framed his questions to impermissibly elicit information about Rogel's probationary status. In fact, Brown's answers were nonresponsive to the prosecutor's questions. Further, the prosecutor heeded the court's admonition and there were no further references to Rogel's probationary status during the remainder of the trial. Thus, we see no prosecutorial misconduct on this point.

### b. Chucky Moniker

Rogel also claims prosecutorial misconduct in connection with Brown's remarks about his gang moniker - Chucky. After eliciting Brown's testimony about the derivation of gang monikers, the prosecutor asked, "Do you know anything regarding Mr. Rogel's association with the word Chucky?" Brown answered, "I've seen it at his house graffiti'd. I've seen it on walls. But other than that, I'm not sure why." The prosecutor then asked, "Do you know what Chucky stems from?" Brown responded, "I know there's a little doll, several horror films called Chucky." Defense counsel objected on relevance and speculation grounds. The court sustained the relevance objection and promptly admonished the jury to disregard that part of Brown's testimony.

21

Nevertheless, Rogel complains, "The gang expert's suggestion at the behest of the prosecutor that appellant was named after a knife-wielding serial killer was highly prejudicial." In essence, Rogel disregards the presumption the jury followed the court's admonition. (*People v. Homick* (2012) 55 Cal.4th 816, 866-867.) We see nothing in the record that supports Rogel's belief the jury disregarded the court's direction and drew wildly negative inferences from Brown's brief and speculative horror film reference. Again, we perceive no prosecutorial misconduct on this issue.

### c. Mexican Mafia

Rogel next claims prosecutorial misconduct in Brown's Mexican Mafia testimony. Recall, Brown said 13 represents the 13th letter of the alphabet, M, and the letter M is associated with "the Mexican Mafia, which most criminal street gangs, the Hispanic ones, fall under." The prosecutor asked, "Is the number 13 often associated with Southern California Hispanic street gangs?" Brown answered, "That's correct." When the prosecutor asked if the number 13 also showed allegiance to something, Brown responded, "Yes. It shows an allegiance to the Mexican Mafia or Sureños." Defense counsel objected on relevance and non-responsive grounds. The court sustained the relevance objection, struck Brown's answer, and instructed the jury to disregard it.

Rogel summarily asserts the trial court's order sustaining defense counsel's objection and striking Brown's second reference to the Mexican Mafia did not cure the prejudice caused by mentioning it. Because this assertion is not supported by authority, reasoned argument, or citations to the record, we need not consider it. (*People v. Islas*, *supra*, 210 Cal.App.4th at p. 128.) Even so, it appears the prosecutor's questions sought to elicit Brown's expert testimony linking the number 13 to southern California street gangs like Underhill. Nothing suggests the prosecutor intentionally elicited Brown's two concededly irrelevant and prejudicial references to the Mexican Mafia. Under these circumstances, we conclude there was no prosecutorial misconduct in connection with Brown's brief references to the Mexican Mafia,

### d. Closing Argument

Finally, Rogel claims prosecutorial misconduct occurred during closing argument, when the prosecutor projected a slide which depicted a chart entitled, "Definitions: 'Criminal Street Gang' – PC 186.22(f)." On one side, the chart listed four elements in the definition of a criminal street gang under Penal Code section 186.22, subdivision (e). On the other side of the chart, there was a highly inflammatory and irrelevant photograph of five shirtless, Hispanic young men with shaved heads. The group of five was kneeling behind some graffiti and displaying gang hand signs. Underneath this picture were two cartoon drawings, one of a gun shooting a bullet and the other of a hand holding pills, a small baggie of methamphetamine, and a marijuana cigarette. Beneath the cartoon drawings was the word "18th St." and beneath that there were two black boxes with the words, "Member" over the word "CONVICTED."

As he projected the slide, the prosecutor told the jury the chart was not related to this case, but simply demonstrative of the facts the People had to prove in order to establish Underhill was a criminal street gang under Penal Code section 186.22, subdivision (e). Defense counsel objected on Evidence Code section 352 grounds "to the slide and the photographs in it." The court immediately directed the prosecutor to take down the slide and called for a chambers conference.

In chambers, the court advised the prosecutor that displaying the chart could constitute prosecutorial misconduct because it might inflame the passions of the jury. The court marked the slide as an exhibit for appellate review, and precluded the prosecutor from projecting the slide during the remainder of closing argument. Back in the courtroom, the court admonished the jury, "the display [the prosecutor] had up for a matter of seconds, as far as I could tell, was inappropriate to demonstrate a point that he was making in his argument. I am directing you to disregard the photograph and the two drawings. They do not appear to be any evidence in this particular case. And I don't believe that you should be making any inference from those items."

23

Again, Rogel did not object on grounds of prosecutorial misconduct, and so has forfeited this claim. Still, nothing in the record demonstrates the brief projection of the slide rendered Rogel's trial "fundamentally unfair," particularly in light of the court's prompt corrective actions, nor is it reasonably probable he would have obtained a more favorable result without the slide. (*People v. Panah*, *supra*, 35 Cal.4th at p. 462.)

*4. Cumulative Prejudice*

Rogel claims the cumulative effect of these alleged instances of prosecutorial misconduct deprived him of his state and federal Constitutional right to a fair trial. We have already concluded Rogel's claimed instances of prosecutorial misconduct were either not misconduct or not prejudicial. In any event, Rogel fails to demonstrate any of the purported errors, whether considered individually or collectively, deprived him of a fair trial, and the evidence of his guilt is overwhelming. Thus, we reject his cumulative error claim. (See *People v. Harris* (2013) 57 Cal.4th 804, 859.)

**DISPOSITION**

The gang enhancement findings on counts 1, 2, and 3 are reversed. The judgment is affirmed in all other respects, and the matter is remanded for resentencing.

THOMPSON, J.

WE CONCUR:

BEDSWORTH, ACTING P. J.

MOORE, J.

24